# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **BRENDA SUE MARSHALL,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. CIV-12-219-SPS |
| | ) | |
| **CAROLYN W. COLVIN,** | ) | |
| Acting Commissioner of the Social | ) | |
| Security Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION AND ORDER

The claimant Brenda Sue Marshall requests judicial review of a denial of benefits by the Commissioner of the Social Security Administration pursuant to 42 U.S.C. § 405(g). She appeals the Commissioner's decision and asserts that the Administrative Law Judge ("ALJ") erred in determining she was not disabled. For the reasons discussed below, the Commissioner's decision is hereby REVERSED and REMANDED to the ALJ for further proceedings.

### Social Security Law and Standard of Review

Disability under the Social Security Act is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[.]" 42 U.S.C. § 423(d)(1)(A). A claimant is disabled under the Social Security Act "only if h[er] physical or mental impairment or impairments are of

---

[1] On February 14, 2013, Carolyn W. Colvin became the Acting Commissioner of Social Security. In accordance with Fed. R. Civ. P. 25(d), Ms. Colvin is substituted for Michael J. Astrue as the Defendant in this action.

such severity that [s]he is not only unable to do h[er] previous work but cannot, considering h[er] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[.]" *Id*. § 423 (d)(2)(A). Social security regulations implement a five-step sequential process to evaluate a disability claim. *See* 20 C.F.R. §§ 404.1520, 416.920.[2]

Section 405(g) limits the scope of judicial review of the Commissioner's decision to two inquiries: whether the decision was supported by substantial evidence and whether correct legal standards were applied. *See Hawkins v. Chater*, 113 F.3d 1162, 1164 (10th Cir. 1997). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971), *quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). *See also Clifton v. Chater*, 79 F.3d 1007, 1009 (10th Cir. 1996). The Court may not reweigh the evidence or substitute its discretion for the Commissioner's. *See Casias v. Secretary of Health & Human Services*, 933 F.2d 799,

---

[2] Step one requires the claimant to establish that she is not engaged in substantial gainful activity. Step two requires the claimant to establish that she has a medically severe impairment (or combination of impairments) that significantly limits her ability to do basic work activities. If the claimant *is* engaged in substantial gainful activity, or her impairment *is not* medically severe, disability benefits are denied. If she *does* have a medically severe impairment, it is measured at step three against the listed impairments in 20 C.F.R. Part 404, Subpt. P, App. 1. If the claimant has a listed (or "medically equivalent") impairment, she is regarded as disabled and awarded benefits without further inquiry. Otherwise, the evaluation proceeds to step four, where the claimant must show that she lacks the residual functional capacity (RFC) to return to her past relevant work. At step five, the burden shifts to the Commissioner to show there is significant work in the national economy that the claimant *can* perform, given her age, education, work experience and RFC. Disability benefits are denied if the claimant can return to any of her past relevant work or if her RFC does not preclude alternative work. *See generally Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).

800 (10th Cir. 1991). But the Court must review the record as a whole, and "[t]he substantiality of the evidence must take into account whatever in the record fairly detracts from its weight." *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488 (1951); *see also Casias*, 933 F.2d at 800-01.

## Claimant's Background

The claimant was born November 12, 1958, and was fifty years old at the time of the administrative hearing. (Tr. 81-82, 239). She completed high school and two years of college, and has worked as yard goods salesperson, benefits clerk II, secretary, and hospital admitting clerk. (Tr. 68, 273). The claimant alleges inability to work since April 11, 2006, due to neuropathy, diabetes, migraines, irritable bowel syndrome (IBS), degenerative disc disease, bursitis of both hips, hammer toes, major recurring depression, recurring kidney stones and bladder infections, sinusitis, and carpal tunnel in both wrists. (Tr. 266).

## Procedural History

On April 28, 2006 the claimant applied for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. §§ 401-434, and supplemental security income benefits under Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-85. His applications were denied. ALJ Glenn A. Neel conducted an administrative hearing and determined that the claimant was not disabled in a written opinion dated January 15, 2009. (Tr. 131-139). The Appeals Council remanded the case (Tr. 141-143), and ALJ Osly F. Deramus conducted a second administrative hearing and determined that the claimant was not disabled in a written decision dated May 26, 2010. (Tr. 12-28). The

Appeals Council then denied review, so ALJ Deramus's written opinion is the Commissioner's final decision for purposes of this appeal. *See* 20 C.F.R. §§ 404.981, 416.1481.

## Decision of the Administrative Law Judge

The ALJ made his decision at step four of the sequential evaluation. He found that the claimant had the residual functional capacity (RFC) to perform sedentary work as defined in 20 C.F.R. §§ 404.1567(a) and 416.967(a), except that she can do frequent fingering and handling but no repetitive functioning such as typing and keyboarding, and that she required a sit/stand option at will and as frequently as every thirty minutes. (Tr. 21). The ALJ thus concluded that the claimant could return to her past relevant work as a benefit clerk. (Tr. 27).

## Review

The claimant contends that the ALJ erred (i) by relying on 2008 Vocational Expert (VE) opinion not found in the record and which conflicted with the 2008 VE's testimony, (ii) by ignoring parts of the reports from her consultative examiner, including noted marked limitations. Because the ALJ does appear to have ignored probative evidence regarding the claimant's impairments, the decision of the Commissioner must be reversed.

The medical evidence reveals that the claimant had the severe impairments of diabetes mellitus, peripheral neuropathy, and arthritis. (Tr. 14). Additionally, the ALJ noted that the claimant had the nonsevere impairments of fibromyalgia, IBS, carpel tunnel syndrome, headache, zoning out, hypertension, obesity, and mental/emotional

problems. (Tr. 14). As to her mental impairments, the medical evidence reveals that Dr. Koteswar Roa Sureddi treated the claimant in 2006. On April 26, 2006, Dr. Sureddi noted her complaints of physical pain, and stated that she was showing signs of depression, had quit her job and was trying to find something else but was unable to concentrate, and that she was showing signs of total disability and inability to work at that time. (Tr. 432). In January 2007, a state reviewing physician found that the claimant had only mild degrees of limitation in the functional limitations, and stated that her condition was essentially in remission. (Tr. 476). Dr. Deborah Fisher treated the claimant on a regular basis for at least four years. In May 2009, the claimant reported that her medication was helping with her depression. (Tr. 539, 345-376, 488-518, 536-584). The claimant was admitted to Griffin Memorial Hospital for two days in June 2009 for threats of suicide and for cutting herself. Upon admission, she was assessed at Global Assessment of Functioning (GAF) score of 25, but had a GAF of 50 upon discharge two days later when she was no longer a danger to herself or others. (Tr. 530, 599-601).

Psychologist Randy Crittenden, Ph.D., performed a consultative psychological evaluation of the claimant on August 17, 2009. (Tr. 587-598). He noted her history and account of her daily activities, and observed that she was neat and appeared to have good hygiene; that her gait, station, and posture were within normal limits, but that psychomotor activity was consistently accelerated because she shook both legs during the interview; that she was not distractible; and there were no readily observable signs of severe physical illness or significant physical pain. (Tr. 594-596). He described her mood as somewhat depressed with affect appropriate to mood; that facies, mood, and

affect were considerably flat and blunted. He further described her as "depressed with blunted affect, but appear[ing] psychologically fragile," noting that she became cheerful for no apparent reason and needed a brief break in the middle of Block Design due to the stress of not correctly responding. (Tr. 596). Dr. Crittenden administered the WAIS III IQ test as well as the MMPI/2. She scored a Verbal IQ of 97, a performance IQ of 92, and a full scale IQ of 95. (Tr. 597). In his opinion, she "did appear to have some genuine psychological difficulties, but also, exaggerated her responses, primarily unconsciously." (Tr. 597). He then stated that despite the claimant's exaggeration, it provided insight because she "appeared to currently be experiencing a genuine amount of emotional turmoil and to have a rather schizoid lifestyle." (Tr. 597). He placed her ability to understand, retain, and follow simple as well as somewhat complex/detailed instructions in the average range, but noted that her ability to do so consistently in a work-like environment appeared relatively poor. (Tr. 598). He diagnosed her with anxiety disorder NOS in complete remission (cutting self in the past); bipolar I disorder, most recent episode depressed, with psychotic features, in partial remission; pain disorder associated with both psychological factors in a general medical condition, chronic; cognitive disorder NOS (periods of "zoning out" of uncertain etiology); alcohol dependence by history; posttraumatic stress disorder; personality disorder NOS (schizoid traits), mild type; fibromyalgia; diabetes; polyneuropathy; migraine headaches; history of surgeries; history of kidney stones; degenerative disc disease; and IBS. He assessed her with a GAF of 50, and stated that her prognosis was considered guarded for any significant change in her psychological functioning within the next year, but noted that she appeared

to be at risk for some unconscious exaggeration of symptoms. (Tr. 598). He also completed a Medical Source Statement, basing his findings on his report, especially the WAIS III and MMPI/2 findings, as well as her behavior during the evaluation. (Tr. 587, 591-592). He indicated that she had marked limitations in the ability to carry out complex instructions and the ability to make judgments on complex work-related decisions. Additionally, he checked that she had moderate limitations in the ability to understand and remember complex interactions, mild limitations in the ability to make judgments on simple work-related decisions, and no limitations in the ability to understand, remember, and carry out simple instructions. (Tr. 587). He indicated that these limitations had been present on an intermittent basis since a nervous breakdown in 1993, and more severe for approximately three and a half years. (Tr. 588, 594).

As to her physical impairments, the claimant received injections for the bursitis in her hips and was prescribed aquatic therapy twice a week for a month. (Tr. 437-438). She also received injections for her carpal tunnel from Dr. Fisher. (Tr. 512, 546, 570, 578). Additionally, a consultative examiner diagnosed her with degenerative disc disease lumbosacral spine, neuropathy lower extremities bilaterally, depression/panic attacks, bilateral carpal tunnel syndrome, migraines, IBS, diabetes mellitus, and nephrolithiasis. (Tr. 448). As to her work-related functions, he stated that she would have some difficulty with a job that required prolonged standing, walking, or carrying, and that her carpal tunnel syndrome would be exacerbated if she had a job which required a fair amount of repetitive finger functioning such as typing or keyboarding. (Tr. 449). A state reviewing physician found that the claimant could do sedentary work. (Tr. 451).

At the administrative hearings, the claimant testified that she has neuropathy, which is her number one problem, in her feet that runs up past her ankles, and swelling in her feet and legs daily if she does not elevate them. (Tr. 626, 629-630). She further testified that she stopped drinking two and a half years earlier because it was making her mental problems worse. (Tr. 631). She testified that she believed her second worst problem was her bipolar disorder. (Tr. 632). She testified that she has been hospitalized twice, in January 1993 and June 2009, for her bipolar disorder, and that most recently she had been cutting herself and had suicidal thoughts that led to her hospitalization. (Tr. 633-634). She stated that she cuts herself when she is really depressed and feeling self-loathing and self-hatred. (Tr. 633). She testified that her panic attacks occur when she is out in public or in a stressful situation. (Tr. 635-636). She continued to discuss her other physical impairments, including diabetes, carpal tunnel, migraine headaches, IBS, and fibromyalgia. (Tr. 641-651). The claimant's sister also testified at the second administrative hearing, stating that the claimant makes no sense when she zones out, that she spends money she does not have and does not sleep during the manic phases of her bipolar disorder. (Tr. 652).

In his written opinion, the ALJ summarized the claimant's hearing testimony as well as the medical evidence. As relevant to this appeal, the ALJ thoroughly discussed Dr. Crittenden's consultative examination findings and assessment at step two, with the purpose of discrediting it. He stated that Dr. Crittenden "offered opinions clearly discordant with his own observations," and appeared "to have 'bought' claimant's story that she stopped working '3 ½ years ago' due to mental difficulties." (Tr. 19). He

discussed the claimant's test scores and the concerns about malingering, and stated that Dr. Crittenden's moderate and marked conclusions "appear inconsistent with the record as a whole." (Tr. 20). He found that her "normal, effective deportment during her evaluation appears inconsistent with Dr. Crittenden's 'moderate limitation' in responding to usual work situations," then stated, "Dr. Crittenden, a skilled practitioner, although he may not have had the essential details or had the actual treatment records, was aware that claimant had been hospitalized, albeit very briefly, only two months before his examination, and his incomplete knowledge might have had adversely informed his opinions." (Tr. 20). He concluded at step two with regard to Dr. Crittenden, "In short, although Dr. Crittenden's mental status/formal test findings have much probative value, Dr. Crittenden's opinions/assessments are less probative, are held in less regard, and are not entitled to substantial weight herein." (Tr. 20).

"An ALJ must evaluate every medical opinion in the record, although the weight given each opinion will vary according to the relationship between the disability claimant and the medical professional. . . . An ALJ must also consider a series of specific factors in determining what weight to give any medical opinion." *Hamlin v. Barnhart*, 365 F.3d 1208, 1215 (10th Cir. 2004) [internal citation omitted] [emphasis added], *citing Goatcher v. United States Department of Health & Human Services*, 52 F.3d 288, 290 (10th Cir. 1995). The pertinent factors include the following: (i) the length of the treatment relationship and the frequency of examination; (ii) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (iii) the degree to which the physician's opinion is supported by relevant

evidence; (iv) consistency between the opinion and the record as a whole; (v) whether or not the physician is a specialist in the area upon which an opinion is rendered; and (vi) other factors brought to the ALJ's attention which tend to support or contradict the opinion. *See Watkins v. Barnhart*, 350 F.3d 1297, 1300-01 (10th Cir. 2003) [quotation marks omitted], *citing Drapeau v. Massanari*, 255 F.3d 1211, 1213 (10th Cir. 2001). Here, the ALJ provided a thorough recounting of Dr. Crittenden's findings and conclusions, but rejected them based on the speculative conclusion that Dr. Crittenden, although a "skilled practitioner" was taken in by the claimant's statements despite the fact that he accounted for her possible malingering in his assessment. *See Langley v. Barnhart*, 373 F.3d 1116, 1121 (10th Cir. 2004) ("The ALJ also improperly rejected Dr. Hjortsvang's opinion based upon his own speculative conclusion that the report was based only on claimant's subjective complaints and was 'an act of courtesy to a patient.' The ALJ had no legal nor evidentiary basis for either of these findings. Nothing in Dr. Hjortsvang's reports indicates he relied only on claimant's subjective complaints or that his report was merely an act of courtesy. 'In choosing to reject the treating physician's assessment, an ALJ may not make speculative inferences from medical reports and may reject a treating physician's opinion outright only on the basis of contradictory medical evidence and *not due to his or her own credibility judgments, speculation or lay opinion*.'"), *quoting McGoffin v. Barnhart*, 288 F.3d 1248, 1252 (10th Cir. 2002).) [quotations omitted] [emphasis in original]. This is especially important when the opinion concerns mental impairments, as "[t]he practice of psychology is necessarily dependent, at least in part, on a patient's subjective statements.") [unpublished opinion].

*Thomas v. Barnhart*, 147 Fed. Appx. 755, 759 (10th Cir. 2005). Next, the ALJ's finding that Dr. Crittenden's knowledge of the claimant's most recent suicide attempt was "incomplete" or somehow adversely affected his assessment is speculation without any support. *See Hardman v. Barnhart*, 362 F.3d 676, 681 (10th Cir. 2004) (noting that the ALJ may not "pick and choose among medical reports, using portions of evidence favorable to his position while ignoring other evidence."), *citing Switzer v. Heckler*, 742 F.2d 382, 385-86 (7th Cir. 1984) ("Th[e] report is uncontradicted and the Secretary's attempt to use only the portions favorable to her position, while ignoring other parts, is improper.") [citations omitted].

Because the ALJ engaged in speculation to discredit evidence that was inconsistent with his RFC determination, the Court cannot find that he performed the proper analysis. *See, e. g., Drapeau*, 255 F.3d at 1214 (A reviewing court is "'not in a position to draw factual conclusions on behalf of the ALJ.'"), *quoting Prince v. Sullivan*, 933 F.2d 598, 603 (7th Cir. 1991). *See also Hamby v. Astrue*, 260 Fed. Appx. 108, 112 (10th Cir. 2008) (noting that when determining a claimant's RFC, the ALJ "must 'consider all of the claimant's medically determinable impairments, singly and in combination; the statute and regulations require nothing less' and a failure to do so 'is reversible error.'") [unpublished opinion], *quoting Salazar v. Barnhart*, 468 F.3d 615, 621 (10th Cir. 2006). Accordingly, the decision of the Commissioner should be reversed and the case remanded to the ALJ for a proper analysis in accordance with the appropriate standards. If such analysis results in adjustment to the claimant's RFC, the

ALJ should re-determine what work, if any, the claimant can perform and ultimately whether she is disabled.

## Conclusion

The Court hereby FINDS that correct legal standards were not applied by the ALJ, and the Commissioner's decision is therefore not supported by substantial evidence. The decision of the Commissioner is accordingly REVERSED and the case is REMANDED for further proceedings consistent herewith.

**DATED** this 26th day of September, 2013.

Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma